FILED ___ ENTERED
___ LODGED ___ RECEIVED

DEC 21 2004

CLERK ... COURT
W ... INGTON
BY ___

03-CV-01415-ORD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CORBIS CORPORATION, a Washington
corporation,

    Plaintiff,

  vs.

AMAZON.COM, INC., a Delaware
corporation, *et al.*,

    Defendants.

NO. CV03-1415L

ORDER REGARDING SUMMARY
JUDGMENT MOTIONS

## I. INTRODUCTION

This matter comes before the Court on cross motions for summary judgment and partial summary judgment filed by plaintiff, Corbis Corporation ("Corbis") and defendant, Amazon.com, Inc. ("Amazon"). For the reasons set forth in this Order, the Court finds that Amazon is protected from liability for copyright infringement occurring on its third party vendor platform, zShops.com. In addition, the Court finds that it lacks subject matter jurisdiction over infringement claims regarding photographs for which Corbis has not obtained copyright registration. Finally, the Court finds that Corbis's federal antitrust and state law claims fail as a matter of law.

In accord with these findings, the Court:

1. Grants Amazon's Motion for Summary Judgment Under the Digital Millennium Copyright Act (Dkt. # 132) ("Def.'s DMCA Mot.");

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS

2.     Denies Corbis's Motion for Partial Summary Judgment Regarding § 512(c) "Safe Harbor" Qualification under the DMCA (Dkt. # 145) ("Pl.'s 512(c) Mot.");

3.     Denies Corbis's Motion for Partial Summary Judgment Against Amazon Precluding Application of DMCA for Lack of Compliance with 17 U.S.C. § 512(i) (Dkt. # 146) ("Pl.'s § 512(i) Mot.");

4.     Grants Corbis's Motion for Partial Summary Judgment Against Amazon as to DMCA Eligibility for Its IMDb Platform (Dkt. # 144) ("Pl.'s IMDb Mot.");

5.     Grants Amazon's Motion for Partial Summary Judgment on Lack of Copyright Registration (Dkt. # 153) ("Def.'s Copyright Reg. Mot.");

6.     Grants Amazon's Motion for Partial Summary Judgment Denying Corbis's Direct Copyright Infringement Claims (Dkt. # 151) ("Def.'s Direct Copyright Inf. Mot.");

7.     Denies Corbis's Motion for Partial Summary Judgment Against Amazon for Direct and Vicarious Copyright Liability (Dkt. # 147) ("Pl.'s Copyright Infr. Mot.");

8.     Grants Amazon's Motion for Partial Summary Judgment on Plaintiff's Trademark and State Law Claims (Dkt. # 132) ("Def.'s Trademark and State Law Mot.");

9.     Denies Amazon's Motion for Partial Summary Judgment on Copyright and Copyright Misuse (Dkt. # 151) ("Def.'s Mot. for Partial Summ. J. on Copyrights and Copyright Misuse");

10.    Denies  Amazon's Motion for Partial Summary Judgment on Plaintiff's Actual Damages (Dkt. # 163); and

11.    Grants Amazon's Motion for Partial Summary Judgment on Plaintiff's Claim and Damages for Tortious Interference with Business Relationships (Dkt. # 105).

At the end of the day, Corbis is left with two remaining claims of direct copyright infringement against Amazon based on allegations that Amazon displayed on its IMDb.com website a photograph of Erika Christensen in which Corbis claims copyright interests under Copyright Registration Nos. VA 1-181-966 and VA 1-207-124.

## II. BACKGROUND

**A.    Procedural Background.**

On June 30, 2003, Corbis filed suit against Amazon and 15 other defendants (the "vendor defendants"). Corbis alleges it holds copyright interests in two photographs that Amazon placed on the website IMDb.com and in hundreds of photographs that were being sold by the vendor defendants on Amazon's website. *Because Corbis did not grant permission to use the photos, it* claims that Amazon directly and vicariously infringed Corbis's copyright interests in violation of 17 U.S.C. §§ 106 & 501 (the "Copyright Act"), engaged in unfair competition in violation of 15 U.S.C. § 1125(a) (the "Lanham Act") and R.C.W. 19.86.020 et seq. (the "Consumer Protection Act"), diluted Corbis's trademarks in violation of 15 U.S.C. § 1125(c) (the "Trademark Act"), and tortiously interferred with Corbis's business relations.

As of September, 2004, Corbis had reached a resolution with each of the vendor defendants, leaving Amazon as the sole remaining defendant. Amazon, for its part, denies the allegations and asserts, as an affirmative defense, that it is immune from liability for copyright infringement under Title II of the Digital Millennium Copyright Act ("DMCA"), 15 U.S.C. § 512, et seq. In addition, Amazon has filed a counterclaim for declaratory relief.

**B.    Factual Background.**

**1.    Amazon's zShops Platform.**

Amazon is a company specializing in electronic commerce. It is most widely known for selling books over the Internet at its website, Amazon.com. The Amazon.com website also hosts several third party vendor platforms, including a platform entitled "zShops."[1] Amazon launched

---

[1]Amazon hosts two other third party vendor platforms at the Amazon.com website. The "Marketplace" platform allows vendors to sell new, used, or collectible versions of items already sold by Amazon. The "Auctions" platform allows vendors to sell items through an online bidding process. Corbis's allegations focus on the zShops platform. Corbis does not allege that its copyrights have been violated by the selling of items on Auctions or Marketplace.

1  the zShops platform in the fall of 1995.  The zShops platform allows individuals and retailers
2  (referred to as "vendors") to showcase their products and sell them directly to online consumers.
3  Amazon, however, does not sell any of its own inventory on the zShops platform.

4      To sell on zShops, a vendor creates a web page on the zShops platform that includes
5  information regarding the product being sold.  These web pages are referred to as "listings," and
6  are created by using tools and forms provided by Amazon.  The forms allow the vendor to
7  describe the product, list the price, and provide an image of the product.  A vendor can include a
8  product image in the listing in one of two ways.  The vendor either creates a link to an image
9  stored on the vendor's computer or server, or uploads an image to one of Amazon.com's servers
10  for display in the listing.  Amazon does not actively participate or supervise the uploading or
11  linking of images, nor does Amazon preview the images before the link is created or the upload
12  completed.

13      Although vendors may accept any variety of payment for their products, if buyers pay by
14  credit, Amazon requires vendors to use its services for processing credit card transactions.
15  Amazon describes its credit card processing service as merely facilitating the monetary exchange
16  between the online buyer and vendor and asserts that it does not conduct the sale of the products
17  offered by the vendors.  If the product is paid for by other means, Amazon has no involvement in
18  the transaction.

19      Vendors must register with Amazon before they list items on zShops.  Amazon charges a
20  fee of $39.99 to all vendors, which allows a vendor to use the zShops platform and Amazon's
21  credit card processing services.  Vendors also pay Amazon a percentage of the price of any
22  products sold.  The percentage ranges from 2.5% to 5%, depending on the price of the item.

23      As part of the registration, vendors must also enter into a Participation Agreement, which
24  states that all vendors are bound by its terms as well as the terms set forth in all policies and
25  guidelines for the zShops site.  The Participation Agreement prohibits vendors from listing or
26

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS            -4-

1    linking to any item that

2        (a) infringes any third-party intellectual property rights (including copyrights,
        trademark, patent, and trade secrets) or other proprietary rights (including rights of
3        publicity or privacy); . . . ; or (c) is counterfeited, illegal, stolen, or fraudulent.

4    Dkt. # 134, Decl. of Eric Orpet in Supp. of Def.'s Mots. for Summ. J. ("Orpet Decl.") at ¶ 29.

5        In addition, vendors are required to abide by the "Community Rules" set forth in the

6    "Help Section" of the Amazon.com site.  The Community Rules state that:

7        Copies, dubs, duplicates, or transfers of books, music, videos, television programs,
        radio programs, concerts, DVDs, software, etc., are prohibited.  Recopied media
8        infringe upon copyrights and trademarks and are illegal to sell.  Just as you cannot
        sell a photocopied book without the author's permission, you cannot sell copies or
9        duplicates of videos, music, video games, software, photos, or any copyrighted
        material without permission of the copyright holder.

10
11   Id. at 39a.  The Community Rules also make reference to, and state that they are incorporated in,

     the Participation Agreement.  See id. at 38.
12

13       In more than one section of the Participation Agreement, Amazon asserts the right to

14   remove listings and terminate services for violations of either the Participation Agreement or

15   Amazon's policies.  For example, the Participation Agreement states that:

16       Amazon.com has the right, but not the obligation, to monitor any activity and
        content associated with this site.  Amazon.com may investigate any reported
17       violation of its policies or complaints and take any action that it deems appropriate.
        Such action may include, but is not limited to, issuing warnings, suspension or
        termination of service, denying access, and/or removal of any materials on the
18       [Amazon.com site], including listings and bids.  Amazon.com reserves the right
        and has absolute discretion to remove, screen, or edit any content that violates
19       these provisions or is otherwise objectionable.

20   Id. at ¶¶ 20-21, p. 34.  The Participation Agreement contains a blanket reservation of Amazon's

21   right, "in its sole discretion . . . to terminate this Participation Agreement, access to the

22   [Amazon.com site] or the [auction or selling services], or any current auctions or fixed price

23   sales immediately without notice for any reason."  Id. at ¶ 22, p. 36.

24       Amazon has established a designated agent responsible for receiving claims of

25   infringement of intellectual property rights.  See id. at ¶ 24.  Contact information for the agent

26

1    has been provided to the Copyright Office and is available on Amazon's website, including on
2    the zShops platform.

3          When Amazon receives information that a vendor may be infringing another's copyrights,
4    Amazon's practice is to cancel the allegedly infringing listing and send an e-mail to the vendor.
5    The e-mail notifies the vendor of the cancellation, identifies a contact e-mail address for the
6    complaining party, and reminds the vendor that "repeated violations of our Community Rules
7    could result in permanent suspension from our Auction, zShops, and Amazon Marketplace
8    sites." Id. at ¶ 25; Dkt. # 148, Decl. of Claire L. Keeley in Supp. of Pl.'s Mots. for Summ. J.
9    ("Keeley Decl."), at 173.

10         The zShops platform contains approximately 40 million listings of items for sale.  From
11   October 2003 to March 2004, Amazon cancelled over one million listings on its zShops and
12   Auctions platforms for violations of the Participation Agreement. See Orpet Decl. at ¶ 26.
13   During that same period, Amazon terminated almost 1,000 vendors for repeat or egregious
14   violations of the Participation Agreement or Community Rules. See id. at ¶ 26.

15         When Amazon first launched zShops in 1999, it contacted some vendors to invite them to
16   list products on the platform.  Two of these vendors, Ricks Movie Graphics and Pix Posters,
17   Inc., were invited to sell their collections of movie posters on zShops.  Amazon did not ask
18   whether these companies also sold celebrity portraits.  A representative from Ricks Movie
19   Graphics stated that during one of these conversations he told Amazon that Ricks Movie
20   Graphics did not own the copyrights to any of the movie posters it sold but that he believed
21   Ricks Movie Graphics had the right to sell everything in its inventory. See Keeley Decl. at 46-
22   47.  Ricks Movie Graphics and Pix Posters, Inc. were named as vendor defendants in this suit.
23   Other vendor defendants assert that they were never contacted by Amazon regarding opening a
24   zShops site.

25

26

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -6-

1    **2.    The IMDb.com Website.**

2        Amazon also owns and operates the Internet Movie Database (IMDb), a website located

3    at www.IMDb.com.  IMDb is an information database regarding movies, actors, and

4    entertainment in general.  Amazon acquired IMDb in the late 1990s.  Although the IMDb site is

5    independent from the Amazon.com site and its third party selling platforms, IMDb contains links

6    to items available on the Amazon.com site.  For instance, IMDb contained a banner

7    advertisement with celebrity photos including two photos in which Corbis claims a copyright

8    interest.  IMDb users who clicked on the banner were linked to zShops and provided with

9    information regarding vendors selling celebrity images.

10    **3.    Corbis Images on zShops and IMDb.com.**

11        Corbis is in the business of licensing art images and photographs, including photographs

12    of celebrities.  As part of its business, Corbis enters into contracts with photographers who take

13    celebrity photos.  Under these contracts, Corbis represents and distributes a photographer's work

14    and, in exchange, is paid a royalty based on the fees charged for licensing the photos.  Corbis

15    also owns exclusive rights to a number of individual photographs and photographic collections.

16        Corbis maintains a copyright registration program for itself and the photographers it

17    represents.  Corbis receives approximately 100,000 images a year from photographers for review

18    and syndication.  If the photographs are not already in digital format, Corbis converts each of

19    them into a digital image.  For some of the images, Corbis employees will add "metadata" to the

20    digital image, such as key words describing the image, photographer, and subject.  Corbis

21    employees will also add visual enhancements to the image.  Every week, Corbis places the

22    images it has received on a computer generated CD-ROM.  At regular intervals, Corbis will

23    prepare a copyright application for the group of images on the CD-ROM.  It submits the CD-

24

25

26

1    ROMs as a deposit with these bulk applications.[2]

2          Corbis has identified a total of 232 images (the "Corbis Images") in which it claims a

3    copyright interest.  Two of the images appeared on the IMDb website.  The remaining 230

4    images have been copied, displayed, and sold by vendor defendants through their zShops sites.[3]

5          When, in February 2003, Corbis first learned that its images were appearing on zShops, it

6    did not tell Amazon or any of the zShops vendors that displaying and selling the Corbis Images

7    infringed Corbis's copyright interests.  Corbis first provided Amazon and the zShops vendors

8    with notice of infringement when Corbis filed and served the Complaint in June, 2003.

9          Upon receiving the Complaint, Amazon terminated the identified accounts of all of the

10   vendor defendants listed in the Complaint and removed the allegedly infringing images on

11   IMDb.  Since its account was terminated, one of the vendor defendants, Posternow, GmbH (also

12   d/b/a Faust Multimedia) ("Posternow"), has opened at least two different vendor accounts with

13   zShops under slightly different names.  These accounts were terminated by Amazon once

14   Amazon was made aware of the their existence.

15

----

16        [2]At times, Corbis will register an image or a group of images on behalf of a photographer.
17   This process will occur in much the same fashion as the bulk registration described above.  In
     addition, some of the photographers represented by Corbis file their own copyright registrations.
18   In those instances, it is Corbis's practice to obtain a copy of the registration from the
19   photographer.

20        [3]There are three types of copyright interests at issue.  First, Corbis asserts the copyright
21   interests of the photographers who took the photos.  See Def.'s Mot. for Partial Summ. J. on
     Copyrights and Copyright Misuse, at 4-5.  Second, Corbis asserts a derivative copyright interest
22   in all images to which it has added digital enhancements, metadata, or keywords.  See id.  Third,
     Corbis contends that the bulk CD-ROM filings submitted to the Copyright Office contain a
23   unique compilation of the photographs, and asserts a copyright interest in those compilations.
24   See id.  Of the 232 images, 49 are subject only to Corbis's derivative and compilation copyright
25   interests.  See id. at 2.  102 images are subject only to the photographers' copyright interests that
     are being pursued by Corbis.  See id.  The remaining 81 images are subject to both Corbis's and
26   the photographers' copyright interests.  See id.

## III. DISCUSSION

This Section is broken into four subsections. Subsection A addresses whether the DMCA protects Amazon from copyright liability for the 230 Corbis Images displayed by the vendor defendants. Subsection B addresses whether this Court has subject matter jurisdiction over copyright infringement claims if the photograph in question has not been registered by the Register of Copyrights. Subsection C addresses Corbis's motion for summary judgment with regard to direct copyright infringement of photographs on IMDb. Subsection D addresses Corbis's Lanham Act and state law claims.

In reaching its conclusions, the Court has been mindful that summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When, as here, parties submit cross-motions for summary judgment, this Court must review the evidence submitted in support of each cross-motion and consider each party's motions on their own merits. See Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). This Court must examine each set of evidence in the light most favorable to the non-moving party. See U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### A.      Amazon's Protection from Copyright Liability Under the DMCA.

Corbis alleges that Amazon infringed its copyrights in 230 Corbis Images that were displayed by the zShops vendors. Amazon has asserted that the DMCA protects it from liability for these alleged copyright violations. Although it may seem premature to address Amazon's DMCA defense before first determining whether Amazon has violated Corbis's copyrights in the 230 zShops images, such an approach makes sense under the circumstances. The DMCA gives an Internet service provider ("ISP") extensive protection against liability, and leaves copyright owners with only limited injunctive relief. As discussed more fully below, the Court finds that

1  Amazon is protected from damages sought by Corbis for the alleged infringement of its
2  copyrights in the images displayed by zShops vendors.  The relief sought by Corbis for the
3  alleged infringements is prohibited under the DMCA.  As a result, even if Corbis's copyright
4  infringement claims can bare fruit, Amazon's liability protection ensures that the claims will
5  whither on the vine.

6      **1.   Overview of the DMCA**

7      In 1998, Congress enacted the DMCA in an effort to resolve the unique copyright
8  enforcement problems caused by the widespread use of the Internet.  See Ellison v. Robertson,
9  357 F.3d 1072, 1076 (9th Cir. 2004); In re Aimster Copyright Litigation, 334 F.3d 643, 655 (7th
10  Cir. 2003); DMCA, Pub. L. No. 105-304, 112 Stat. 2860 (1998).  Tackling copyright
11  infringement on the Internet required balancing the competing interests of several groups.  The
12  first set of competing interests includes those of copyright holders and end users.  The DMCA
13  "intended to 'balance the need for rapid response to potential infringement with the end-users
14  [sic] legitimate interests in not having material removed without recourse.'"  Rossi v. Motion
15  Picture Assoc. of America, No. 03-16034, slip op. 16421, 16427 (9th Cir. Dec. 1, 2004) (quoting
16  S. Rep. No. 105-190, at 21 (1998) (alterations in original)).  The second set of competing
17  interests were those of copyright holders and ISPs whose services may be used to infringe
18  copyrights.  The DMCA intended to balance the interests of these parties by creating a
19  mechanism for rights holders to inform ISPs of potentially infringing conduct while, at the same
20  time, providing "greater certainty to service providers concerning their legal exposure for
21  infringements that may occur in the course of their activities."  Ellison, 357 F.3d at 1076
22  (quoting S. Rep. No. 105-190, at 20 (1998); H.R. Rep. No. 105-551, pt. 2, at 49 (1998)).

23      This balancing effort resulted in a statute that creates "'strong incentives for service
24  providers and copyright owners to cooperate to detect and deal with copyright infringements that
25  take place in the digital network environment.'"  Rossi, No. 03-16034 at slip op. 16427 (quoting
26  H.R. Rep. No. 105-551, pt. 2, at 49 (1998)).  For instance, a copyright owner who suspects that

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -10-

1    her copyright is being infringed "must follow the notice and take down provisions set forth in

2    § 512(c)(3) of the DMCA." Id. at slip op. 16427-28.  Once properly notified, a service provider

3    must "respond[] expeditiously to remove, or disable access to, the material that is claimed to be

4    infringing." Recording Industry Ass'n of America v. Verizon Internet Servs., 351 F.3d 1229,

5    1234 (D.C. Cir. 2003).  If a service provider fails to take down the potentially infringing

6    material, it exposes itself to copyright liability.

7       In addition to these notice and take down provisions, the DMCA also establishes several

8    "safe harbors" that protect certain common activities of ISPs. See S. Rep. No. 105-190, at 19;

9    H.R. Rep. No. 105-551, pt. 2, at 41-42.  The DMCA safe harbors do not render a service

10    provider immune from copyright infringement.  See Ellison, 357 F.3d at 1077.  They do,

11    however, protect eligible service providers from all monetary and most equitable relief that may

12    arise from copyright liability.  See id.; 17 U.S.C. § 512(a)-(d), (j).  Thus, even if a plaintiff can

13    show that a safe harbor-eligible service provider has violated her copyright, the plaintiff will

14    only be entitled to the limited injunctive relief set forth in 17 U.S.C. § 512(j).  See 17 U.S.C.

15    §§ 512(a)-(d), (j); Verizon Internet Servs., 351 F.3d at 1234.

16       The DMCA "safe harbors provide protection from liability for: (1) transitory digital

17    network communications; (2) system caching; (3) information residing on systems or networks

18    at the direction of users; and (4) information location tools." Ellison, 357 F.3d at 1076-1077

19    (citing 17 U.S.C. §§ 512(a)-(d)).

20       To be eligible for any of the safe harbors, a service provider must meet a series of

21    threshold conditions.  At the outset, a party seeking safe harbor must, in fact, be a "service

22    provider" as that term is defined under the DMCA.  See 17 U.S.C. § 512(k)(1)(B).  If it fits

23    within that definition, the service provider must then show that it

24        (A) has adopted and reasonably implemented, and informs subscribers and account
         holders of the service provider's system or network of, a policy that provides for
25        the termination in appropriate circumstances of subscribers and account holders of
         the service provider's system or network who are repeat infringers; and
26

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS         -11-

1   (B) accommodates and does not interfere with standard technical measures.[4]

2   17 U.S.C. § 512(i); accord Ellison, 357 F.3d at 1080.  A service provider that does not meet

3   these threshold conditions may not invoke the DMCA's safe harbor limitations on liability.  See

4   Ellison, 357 F.3d at 1080.

5   Once the threshold conditions have been met, a service provider must then satisfy the

6   specific requirements for the particular safe harbor.  Amazon asserts that it is entitled to

7   protection for information residing on systems or networks at the direction of users.  See 17

8   U.S.C. § 512(c).  The § 512(c) safe harbor protects a service provider from liability for

9   "infringement of copyright by reason of the storage at the direction of a user of material that

10   resides on a system or network controlled or operated by or for the service provider."  To qualify

11   for the § 512(c) safe harbor, a service provider must show that:

12   (1) it has neither actual knowledge that its system contains infringing materials nor
an awareness of facts or circumstances from which infringement is apparent, or it

13   has expeditiously removed or disabled access to infringing material upon obtaining
actual knowledge of infringement;

14

15   (2) it receives no financial benefit directly attributable to infringing activity; and

16   (3) it responded expeditiously to remove or disable access to material claimed to
be infringing after receiving from the copyright holder a notification conforming
with requirements of § 512(c)(3).

17

18   ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 623 (4th Cir. 2001) (citing 17

19   U.S.C. § 512(c)(1)).  Corbis, for its part, asserts that Amazon does not qualify for liability

20   protection both because it does not satisfy the threshold conditions and because it does not meet

21   the § 512(c) requirements.

22

23

24   _____

25   [4]The term "standard technical measures" refers to technical means by which copyright
owners may identify or protect copyrighted works.  See Ellison, 357 F.3d at 1080.

26

1     **2.    Threshold Conditions for DMCA Liability Protection.**

2         **a.    Is Amazon a "Service Provider" Under the DMCA?**

3         Protection from copyright liability under the DMCA is only available to entities that meet

4 the statute's definition of a "service provider."  See 17 U.S.C. § 512(k)(1).  For purposes of the

5 § 512(c) safe harbor,[5] a service provider is defined as "a provider of online services or network

6 access, or the operator of facilities therefor."  See 17 U.S.C. § 512(k)(1)(B).  This definition

7 encompasses a broad variety of Internet activities, see, e.g., Aimster, 334 F.3d at 655; ALS Scan,

8 239 F.3d at 623, and there is no doubt that Amazon fits within the definition.  See Hendrickson

9 v. Amazon.Com, 298 F.Supp.2d 914, 915 (C.D. Cal. 2003) (holding that Amazon meets the

10 DMCA's definition of a service provider).  Amazon operates web sites, provides retail and third

11 party selling services to Internet users, and maintains computers to govern access to its web

12 sites.[6]  These activities fall squarely within the broad scope of the § 512(k)(1)(B) definition of

13 "service provider."  See, e.g., Hendrickson v. eBay, Inc., 165 F.Supp.2d 1082, 1088 (C.D. Cal.

14 2001) (eBay, an operator of an Internet website for purchase and sale of consumer goods,

15 qualifies as a service provider).

16         **b.    Has Amazon Adopted and Reasonably Implemented a User Policy?**

17         The Ninth Circuit has held that the DMCA's infringement policy requirement has three

---

20     [5]The DMCA also provides a different, more restrictive, definition of "service provider."
See 17 U.S.C. § 512(k)(1)(A).  This definition only applies to entities seeking protection from
21 liability under the "transitory digital network communications" safe harbor.  See 17 U.S.C.
§ 512(a).  The more restrictive definition does not apply to an entity, such as Amazon, that seeks
22 protection under the "information residing on systems or networks at the direction of users" safe
23 harbor.  See 17 U.S.C. § 512(k)(1)(B).

24     [6]Corbis argues that Amazon is not a service provider because Amazon does not "serve to
25 route or connect online digital communications."  Dkt. # 175, Pl.'s Opp. to Def.'s DMCA Mot.
at 7.  This argument is unavailing.  The relevant definition of service provider does not require
26 Amazon to engage in such activity.  See 17 U.S.C. § 512(k)(1)(B).

1   prongs. See Ellison, 357 F.3d at 1080. A service provider must: 1) adopt a policy that provides

2   for the termination of service access for repeat copyright infringers in appropriate circumstances;

3   2) inform users of the service policy; and 3) implement the policy in a reasonable manner. See

4   id. As discussed below, Amazon has satisfied each of the three Ellison prongs.

5                   **i.       Amazon Has Adopted a User Policy.**

6          It is undisputed that Amazon requires each zShops vendor to accept a Participation

7   Agreement that sets forth guidelines for the use of the zShops platform. See Pl.'s § 512(i) Mot.

8   at 3. Nevertheless, Corbis argues that Amazon has not adopted an infringement policy under

9   § 512(i). Corbis's primary complaint is that the Participation Agreement and related policies are

10  too vague with regard to issues of copyright infringement. For example, Corbis points out that

11  Amazon's user policies do not include the term "repeat infringer" and do not describe the

12  methodology employed in determining which users will be terminated for repeated copyright

13  violations. Corbis asserts that without such information, Amazon has not sufficiently informed

14  its users of the type of conduct that will cause them to be denied access to Amazon's services.

15         The language of § 512(i) and the overall structure of the DMCA indicate that the user

16  policy need not be as specific as Corbis suggests. The language of § 512(i) is telling in this

17  regard. The key term, 'repeat infringer,' is not defined and the subsection never elaborates on

18  what circumstances merit terminating a repeat infringer's access. This open-ended language

19  contrasts markedly with the specific requirements for infringement notices and take-down

20  procedures set forth in § 512(c). See Batzel v. Smith, 333 F.3d 1018, 1031 (9th Cir. 2003), cert.

21  denied, ___ U.S. ___, 124 S.Ct. 2812, 159 L.Ed.2d 246 (2004). The notice and take-down

22  provisions demonstrate that Congress infused the statute with specific detail when it so chose.

23  The fact that Congress chose not to adopt such specific provisions when defining a user policy

24  indicates its intent to leave the policy requirements, and the subsequent obligations of the service

25  providers, loosely defined.

26         The open-ended language makes sense given the overall structure of the DMCA. In its

1   recent discussion of the DMCA, the Ninth Circuit reminded that "'the words of a statute must be
2   read in their context and with a view to their place in the overall statutory scheme.'" Rossi, No.
3   03-16034 at slip op. 16431 (quoting The Wilderness Soc. v. U.S. Fish & Wildlife Servs., 353
4   F.3d 1051, 1060 (9th Cir. 2003) (en banc), amended by 360 F.3d 1374 (9th Cir. 2004)).  The
5   DMCA's balancing efforts reflect an understanding that "there are different degrees of online
6   copyright infringement, from the inadvertent to the noncommercial, to the willful and
7   commercial." S. Rep. No. 105-190, at 32; H.R. Rep. No. 105-551, pt. 2, at 44.  Given the
8   complexities inherent in identifying and defining online copyright infringement, § 512(i) does
9   not require a service provider to decide, ex ante, the specific types of conduct that will merit
10  restricting access to its services.  As Congress made clear, the DMCA was drafted with the
11  understanding that service providers need not "make difficult judgments as to whether conduct is
12  or is not infringing." See id.

13          This does not mean that the first prong of the Ellison test is a paper tiger.  To the contrary,
14  it is clear that a properly adopted infringement policy must convey to users that "those who
15  repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual
16  property rights of others . . . know that there is a realistic threat of losing that access." Id.
17  Amazon's policies convey this message.  Each vendor must agree to the terms of the
18  Participation Agreement before selling on the zShops platform. See Pl.'s 512(i) Mot. at 3.  The
19  Participation Agreement prohibits the listing, linking, or posting of any material that violates
20  copyright laws, see Orpet Decl. at ¶ 9, p. 30, and makes it clear that those who violate Amazon's
21  policies may face a variety of penalties, including restricting access to Amazon's sites and
22  suspension or termination of service, see id. at ¶¶ 20-21, pp. 32-34.  Finally, and perhaps most
23  importantly, those accused of copyright infringement are informed that repeated violations could
24  result in "permanent suspension" from Amazon sites. See Keeley Decl. at 173.  Although
25  Amazon does not use the term "repeat infringer" or precisely track the language of the DMCA,
26  the evidence shows that Amazon has adopted a termination policy as required under § 512(i).

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -15-

1    **ii.    Amazon Has Communicated Its Termination Policy to Its Users.**

2    Although the evidence indicates that Amazon required users to enter into the Purchase

3    Agreement and accept the Community Rules, Corbis asserts that Amazon has not communicated

4    its infringement policy to its users. See Dkt. # 205, Reply in Supp. of Pl.'s 512(i) Mot. ("512(i)

5    Reply") at 8. Corbis argues that Amazon had two policies, one it presented to users in the form

6    of the Participation Agreement and Community Rules and a second, internal policy that was not

7    described in the agreements and rules presented to vendors. See id. at 8. The internal policy

8    Corbis refers to is a set of criteria used by Amazon when determining whether to terminate a

9    user's access to the site. Corbis argues that these internal criteria make up Amazon's actual

10   policy on infringement. Since the internal criteria were never communicated to users, Corbis

11   argues, Amazon has failed to satisfy this prong of the Ellison test.

12   Section 512(i), however, is not so exacting. Amazon need only inform users that, in

13   appropriate circumstances, it may terminate the user's accounts for repeated copyright

14   infringement. See, e.g., In re Aimster Copyright Liability, 252 F.Supp.2d 634, 659 (N.D. Ill.

·15  2002), aff'd, 334 F.3d 643 (8th Cir. 2004) (policy communicated when users informed they "may

16   have their access to all services terminated" for repeated copyright violations) (emphasis added);

17   Perfect 10, Inc. v. CCBill, LLC, 340 F.Supp.2d 1077, 1088-89 (C.D. Cal. 2004) (policy stating

18   user's access may be terminated deemed sufficient communication). The statute does not

19   suggest what criteria should be considered by a service provider, much less require the service

20   provider to reveal its decision-making criteria to the user. Amazon need only put users on notice

21   that they face exclusion from the service if they repeatedly violate copyright laws. Amazon has

22   done so, and has satisfied this prong of the Ellison test.

23   **iii.    Amazon Has Reasonably Implemented Its Infringement Policy.**

24   The final Ellison prong requires Amazon to reasonably implement its infringement policy.

25   See Ellison, 357 F.3d at 1080; 17 U.S.C. § 512(i)(A). Section 512(i) provides little guidance on

26   what constitutes reasonable implementation of an infringement policy. Cases that have

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                          -16-

1    addressed this issue generally raise two questions. The first is whether the service provider

2    adopted a procedure for receiving complaints and conveying those complaints to users. See id.

3    If such a procedure has been adopted, then the second question is whether the service provider

4    nonetheless still tolerates flagrant or blatant copyright infringement by its users. See Perfect 10,

5    Inc. v. Cybernet Ventures, 213 F.Supp.2d 1146, 1177-78 (C.D. Cal. 2002).

6                           **(a)    Procedure for Receiving and Conveying Complaints.**

7           In Ellison, the Ninth Circuit addressed the first question, regarding procedural

8    implementation of an infringement policy. See Ellison, 357 F.3d at 1080. The Court analyzed

9    America Online Inc.'s ("AOL's") infringement policy and identified flaws in how the policy had

10   been implemented. At the time of the allegedly infringing activity, AOL had changed the e-mail

11   address to which infringement notifications were to be sent but did not forward messages sent to

12   the old address or notify senders that the old e-mail address was inactive. Instead, "AOL

13   allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded."

14   Id. Because of this flawed notification procedure, the Court found that it was "difficult to

15   conclude as a matter of law . . . that AOL had 'reasonably implemented' a policy against repeat

16   infringers." Id.

17          The Northern District of Illinois reached a similar conclusion in Aimster, 252 F.Supp.2d

18   at 659. When determining whether a repeat infringer policy had been reasonably implemented,

19   the court focused on whether the policy allowed the service provider to communicate

20   infringement notices to the service users. In Aimster, defendant had adopted a repeat infringer

21   policy but, because of defendant's own encryption system, could not identify infringing users.

22   The court held that defendant's repeat infringer policy had not been properly implemented. As

23   the court noted, "adopting a repeat infringer policy and then . . . eviscerating any hope that such

24   a policy could ever be carried out is not an 'implementation' as required by § 512(i)." Id.

25          Here, the evidence indicates that Amazon developed a sufficient procedure for

26   implementing its infringement policy. It is undisputed that Amazon's zShops platform includes

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -17-

1    over 40 million listings. See Orpet Decl. at ¶ 27. Amazon has cancelled millions of listing for

2    violations of its user policies. See id. at ¶ 26. Amazon notifies the vendor of the cancellation

3    through e-mail and warns that repeated violations of the rules may result in "permanent

4    suspension" from Amazon cites. See Keeley Decl. at 173. In addition, Amazon has terminated

5    access to zShops for hundreds of vendors for egregious or repeated violations of its user policies.

6    See Orpet Decl. at ¶ 26.

7        Corbis points out that these figures do not differentiate between action taken for copyright

8    infringement and action taken for other policy violations. The evidence, however, indicates that

9    Amazon does respond to allegations of copyright infringement. See Keeley Decl. at ¶ 15, pp.

10   123-131. Amazon's practice is to promptly cancel a listing once it receives adequate notice that

11   the listing violates another's copyrights. See Keeley Decl. at 105-106. Amazon informs the

12   listing vendor via e-mail that "your listing may have violated the intellectual property rights of

13   others and the Community Rules that govern our Auction, zShops, and Amazon Marketplace

14   sites." Orpet Decl. at ¶ 25. The e-mail also provides the vendor with the complaining party's

15   contact information. See id. Finally, as with other cancellations, Amazon warns vendors that

16   repeated violations may result in permanent suspension from the Amazon site. See Orpet Decl.

17   at ¶ 25. This evidence indicates that Amazon has properly implemented a procedure for

18   addressing copyright complaints and enforcing violations of its policies.

19       As Corbis points out, however, Amazon's infringement policy has not been able to

20   prevent certain vendors from reappearing on the zShops platform under pseudonyms. Even

21   though Amazon's policies prohibit vendors from opening new accounts once the original

22   account has been terminated, see Keeley Decl. at 95, Posternow has been able to open at least

23   two new accounts under slightly different names since it was initially terminated in June 2003.

24   See Dkt. # 191, Decl. of Claire Keeley in Supp. of Opps. to Summ. J. Mots. ("Keeley Opp.

25   Decl."), at 651-655.

26       Although this type of behavior is understandably vexing for a copyright holder like

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -18-

1    Corbis, it is not clear how Posternow's efforts to sidestep Amazon's policies amount to a failure

2    of implementation.  Corbis has not alleged that Amazon intentionally allowed Posternow to open

3    a zShops account or suggested that a more effective means of denying Posternow's access could

4    have been implemented by Amazon.  Compare A&M Records, Inc. v. Napster, Inc., 2000 U.S.

5    Dist. LEXIS 6243, *28-29; 2000 WL 573136, *9 (N. D. Cal. 2000) (expert evidence that

6    additional measure to thwart repeat violations could have been taken).

7         Instead, Corbis merely asserts that Posternow's reappearance shows that the infringement

8    policy is a failure.  This argument, however, fails to pass summary judgment muster.  Corbis is

9    required to present "specific facts showing that there is a genuine issue for trial." Celotex Corp.

10   v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  An infringement policy

11   need not be perfect; it need only be reasonably implemented.  See CCBill 340 F.Supp.2d at

12   1089.  Here, Corbis has not brought forth any facts to suggest that Amazon could have used

13   another, more effective and reasonable, method for preventing disingenuous users from re-

14   accessing zShops.[7]  In Napster, by comparison, the copyright holder plaintiffs avoided summary

15   judgment on § 512(i) by providing expert testimony that Napster could have kept terminated

16   users from re-accessing the service by blocking the user's Internet protocol address.  See

17   Napster, 2000 U.S. Dist. LEXIS 6243, *28-29; 2000 WL 573136, *9.  Corbis's silence in this

18   regard is telling.  The mere fact that Posternow appeared on zShops under a different user name

19   and identity does not, by itself, create a legitimate question of fact regarding the procedural

20   implementation of Amazon's termination policy.

21                    **(b). Tolerating Flagrant or Blatant Copyright Infringement.**

22         Even with proper enforcement procedures, a copyright holder may still demonstrate that

23

24         [7]In some respects, the evidence regarding Posternow's efforts to continue to sell on

25   zShops suggests that Amazon's procedures for dealing with repeat infringers are properly
     implemented.  Each time that Amazon has been made aware of Posternow's pseudonymous

26   zShop sites, Amazon has immediately cancelled the listings and terminated the account.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -19-

1  the service provider has not satisfied § 512(i) if there are specific instances demonstrating that

2  the service provider tolerates repeat copyright infringement by its users.  As § 512(i) makes

3  clear, however, termination of a user because of repeated copyright infringement is required only

4  in "appropriate circumstances."  See 17 U.S.C. § 512(i).  Amazon need not conduct active

5  investigation of possible infringement or make a decision regarding difficult infringement issues.

6  See Cybernet, 213 F.Supp.2d at 1176-77.  Because it does not have an affirmative duty to police

7  its users, failure to properly implement an infringement policy requires a showing of instances

8  where a service provider fails to terminate a user even though it has sufficient evidence to create

9  actual knowledge of that user's blatant, repeat infringement of a willful and commercial nature.

10  See Cybernet, 213 F.Supp.2d at 1177; see also, Costar Group Inc. v. Loopnet, Inc., 164

11  F.Supp.2d 688, 703 (D. Md. 2001) (citing H.R. Rep. No. 105-551, Part 2, at p. 61), aff'd, 373

12  F.3d 544 (4th Cir. 2004).

13          Corbis identifies two specific vendors that it believes typify Amazon's failed

14  implementation – Famed & Framed and Posternow.  Corbis provides evidence that, between

15  October, 2002 and February, 2003, Amazon received three e-mails in which the sender claimed

16  that zShops listings posted by Famed & Framed violated the sender's copyrights.  See Pl.'s

17  512(i) Mot. at 6-7.  Similarly, between June, 2002 and February, 2003, Amazon received seven

18  e-mails in which the sender claimed that zShops listings posted by Posternow violated the

19  sender's copyrights.  See id. at 7.  Both Famed & Framed and Posternow were vendor

20  defendants in this lawsuit.[8]  Amazon did not terminate either party's access to zShops until after

21  this suit was filed.  See Orpet Decl. at ¶ 30.

22          The Famed & Framed and Posternow examples do not provide evidence that Amazon had

23  knowledge of blatant, repeat infringement that would have required Amazon to terminate access

24

25

26          [8]None of the e-mails to Amazon in which the senders complained that Famed & Framed
   or Posternow were infringing copyrights were sent by Corbis or its representatives.

1   to the vendors' zShops sites.  Although efforts to pin down exactly what amounts to knowledge

2   of blatant copyright infringement may be difficult, it requires, at a minimum, that a service

3   provider who receives notice of a copyright violation be able to tell merely from looking at the

4   user's activities, statements, or conduct that copyright infringement is occurring.  See Cybernet,

5   213 F.Supp.2d at 1177.  Examples of such blatant infringement may include statements from the

6   vendor that a product is bootlegged or pirated, see eBay, 165 F.Supp.2d at 1093 n.14, chat rooms

7   hosted by the service provider in which users discuss how the service can be used to circumvent

8   copyright laws, see Aimster, 252 F.Supp.2d at 652, or the offering of hundreds of audio files in a

9   single day for peer to peer copying, see Verizon Internet Srvs., 351 F.3d at 1233.  Corbis has

10  presented no such examples of blatant infringing activity on the vendor defendants' zShops cites.

11          Corbis argues, however, that the notices regarding infringing items on Famed & Framed

12  and Posternow were sufficient to show blatant copyright infringement.  Even assuming that the

13  notices complied with the DMCA's notice requirements, see 17 U.S.C. § 512(c)(3), such notices

14  are not the sine qua non of copyright liability.[9]  See Ellison, 357 F.3d at 1077 (claims for on-line

15  copyright infringement are evaluated just as they would be in the non-online world).  A

16  copyright owner may have a good faith belief that her work is being infringed, but may still be

17  wrong.  The notification requirement does not take into account that a vendor may a have "a

18  legitimate fair use defense, or can otherwise invoke any of the myriad other factors that go into

19  evaluating a copyright infringement claim."  3 Melville B. Nimmer & David Nimmer, NIMMER

20  ON COPYRIGHT, § 12B.02[B][2], at12B-36.  Although the notices have brought the listings to

21

22          [9]In this regard, this Court respectfully disagrees with CCBill, in which the district court
23  for the Central District of California held that receipt by the service provider of two or more
    DMCA compliant notices about one of its users required termination under § 512(i).  See 340
24  F.Supp.2d at 1088.  Although there may be instances in which two or more DMCA compliant
25  notices make a service provider aware of a user's blatant, repeat infringement, the notices alone
    do not make the user's activity blatant, or even conclusively determine that the user is an
26  infringer.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS          -21-

1    Amazon's attention, they did not, in themselves, provide evidence of blatant copyright

2    infringement.

3          Corbis cites testimony from Eric Orpet, Amazon's quality compliance manager, as

4    evidence that Amazon knew a portion of Posternow's inventory was infringing based on the

5    notices of infringement.  When confronted with the notices of infringement, Mr. Orpet stated

6    that, "based on what has been communicated to us, a small portion of [Posternow's] inventory

7    would be construed as infringing." See Keeley Decl. at 118.  This statement was made after a

8    discussion in which Mr. Orpet repeatedly asserted that the term "repeat infringer" had not been

9    defined. See id. at 115, 119.  In addition, Mr. Orpet asserted that Posternow was not a repeat

10   infringer, but that Amazon had "received repeat violation notification emails" about Posternow.

11   See id. at 122.

12         In evaluating Mr. Orpet's statements, the recent Rossi decision is instructive.  In Rossi,

13   the Ninth Circuit held that the term "knowing misrepresentation," as it is used in the DMCA,

14   requires "actual knowledge of misrepresentation." See Rossi, No. 03-16034 at slip op. 16431.

15   A party does not make a knowing misrepresentation "simply because an unknowing mistake is

16   made, even if [the party] acted unreasonably in making the mistake." Id.  Here, even if Amazon

17   acted unreasonably when it failed to terminate Posternow, that unreasonable act is not the

18   equivalent of having actual knowledge that Posternow was engaged in blatant, repeat

19   infringement.  Actual knowledge of blatant, repeat infringement cannot be imputed merely from

20   the receipt of notices of infringement.  Instead, there must be additional evidence available to the

21   service provider to buttress the claim of infringement supplied by the notices.  Here, Corbis

22   provides no additional evidence that was available to Amazon that would have led Amazon to

23   conclude that Posternow was a blatant, repeat infringer.

24         In fact, outside of the third party notices, Corbis lacks other evidence that Amazon

25   ignored blatant copyright infringement by Posternow and Famed & Framed.  For instance, there

26   is no evidence suggesting that Amazon would have been able to tell, merely by looking at the

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -22-

1 Famed & Framed and Posternow listings, that the posters and photos being sold infringed

2 another's copyrights. Without some evidence from the site raising a red flag, Amazon would not

3 know enough about the photograph, the copyright owner, or the user to make a determination

4 that the vendor was engaging in blatant copyright infringement. See S. Rep. No. 105-190, p. 30

5 (merely being aware of "one or more well known photographs of a celebrity at a site" does not

6 provide a service provider with knowledge of possible infringement).

7   With respect to Famed & Framed, Corbis makes much of evidence that Amazon knew

8 that Famed & Framed did not own the copyrights to the posters and images it sold. See Pl.'s

9 512(c) Mot. at 8. Corbis, however, presents this evidence in a somewhat selective fashion.

10 Corbis neglects to mention that the Famed & Framed representative unequivocally stated that he

11 informed Amazon that Famed & Framed had the right to sell all of the posters in its inventory.

12 See Keeley Decl. at ¶ 10, p. 48. As Corbis is aware, owning a copyright and having the legal

13 right to sell the copyrighted image are two very different things.

14   In fact, there is at least some evidence to suggest that Posternow and Famed & Framed

15 were not the kind of "repeat infringers" envisioned under § 512(i). As late as July, 2003,

16 Posternow indicated to Amazon that all of its products were officially licensed. See id. at ¶ 25,

17 pp. 170, 171. In addition, there is evidence that Famed & Framed attempted to work with

18 Amazon to ensure that allegedly infringing items did not get re-listed on zShops. See id. at ¶ 26,

19 p. 174. Such assertions by the two users militate against a finding that Amazon turned a blind

20 eye to blatant, repeat infringement. Indeed, for Amazon to determine that these two users were

21 infringers, it would have had to conduct the type of investigation that the courts and the

22 legislature has found unnecessary. See Cybernet, 213 F.Supp.2d at 1176-77.

23     **c.**   **Does Amazon Accommodate and Not Interfere with Standard**
      **Technical Measures?**

24

25   Corbis has not challenged Amazon's assertion that it accommodates and does not

26 interfere with standard technical measures used to identify and protect copyrighted works.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS      -23-

1  Accordingly, this Court finds that this threshold condition has been met.

2      **3.    The Safe Harbor Conditions Under § 512(c).**

3      Having satisfied the threshold conditions, Amazon must still meet the three conditions for

4  liability protection set forth in § 512(c)(1)(A)-(C).  First, Amazon must show that it does not

5  have actual or apparent knowledge that material on its network is infringing.  See 17 U.S.C.

6  § 512(c)(1)(A)(i) & (ii).  If Amazon does have actual or apparent knowledge, it must show that it

7  acted "expeditiously to remove, or disable access to, the [infringing] material."  17 U.S.C.

8  § 512(c)(1)(A)(iii).  Second, Amazon must show that it does not receive a financial benefit

9  directly attributable to any infringing activity that it maintains the right and ability to control.

10  Third, Amazon must show that it has expeditiously removed or disabled access to allegedly

11  infringing material for which it has received appropriate notice under § 512(c)(3).

12      Amazon asserts that it has met all the elements necessary to invoke liability protection

13  under § 512(c).  Corbis does not challenge Amazon's claim that it acts expeditiously to remove

14  or disable access to allegedly infringing material in accord with the third safe harbor element.

15  Corbis argues, however, that Amazon does not fulfill the requirements of § 512(c)(1) because

16  (a) it knew or should have known of infringements of Corbis Images by zShops vendors, and

17  (b) it receives a financial benefit directly attributable to the infringing activity and has the right

18  and ability to control such activity.

19         **a.    Knowledge of Infringement.**

20      To enjoy the § 512(c) safe harbor Amazon must show that it (1) does not have actual

21  knowledge that the material or an activity using the material on the system or network is

22  infringing, and (2) is not aware of facts or circumstances from which infringing activity is

23  apparent.  If a service provider does obtain either actual or apparent knowledge, it may still

24  invoke the § 512(c) safe harbor if it acts expeditiously to remove or disable access to the

25  infringing material

26      In all of the published cases addressing the knowledge component of § 512(c), the

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS        -24-

1   copyright holder has provided evidence that it notified the service provider of the infringing

2   material. See, e.g., Ellison, 357 F.3d at 1075 (DMCA compliant notice sent to service provider);

3   ALS Scan, 239 F.3d at 620-21 (pre-suit letter substantially complying with DMCA sent to

4   service provider); Amazon, 298 F.Supp.2d at 915 (plaintiff attempted to notify service provider);

5   eBay, 165 F.Supp.2d at 1084-85 (non-DMCA-compliant cease and desist letters sent); CoStar,

6   164 F.Supp.2d at 703 (plaintiff sent DMCA notification of claimed infringement). The notice of

7   infringement constitutes evidence of the service provider's knowledge. Under the DMCA, the

8   service provider may attempt to refute this knowledge by showing that the notice failed to

9   substantially comply with the DMCA's notice requirements. See 17 U.S.C. § 512(c)(3)(B).

10      This case differs from other cases addressing the § 512(c) knowledge component. Here,

11   Corbis acknowledges that it never attempted to notify Amazon that zShops vendors were selling

12   images that violated Corbis copyrights. Corbis chose not to address the copyright infringement

13   issues through the DMCA's notice provisions, but instead decided to file this infringement suit.

14   Corbis, of course, was under no obligation to give notice of claimed infringement before filing

15   this suit. See H.R. Rep. No. 105-551, pt. 2, at 54. Its decision to forego the DMCA notice

16   provisions, however, stripped it of the most powerful evidence of a service provider's

17   knowledge – actual notice of infringement from the copyright holder. See 3 NIMMER ON

18   COPYRIGHT, § 12B.04[A][3], at 12B-53.

19      Corbis asserts that its decision to forego notice is of no import. It proffers evidence of

20   notices provided by other copyright holders addressing non-Corbis photos. In addition, Corbis

21   provides evidence suggesting that Amazon was aware that Corbis licensed celebrity photos.

22   Based on this evidence, Corbis argues that Amazon should have known that zShops vendors sold

23   infringing Corbis Images.

24      This evidence does not create a material issue of fact regarding either Amazon's actual

25   knowledge or its apparent knowledge of infringing material on the zShops platform. With

26   regard to actual knowledge, this evidence is wholly insufficient. Taken in the light most

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                     -25-

1  favorable to Corbis, the evidence shows that Amazon knew Corbis licensed celebrity photos and

2  that celebrity photos were vulnerable to copyright infringement.  The issue is not whether

3  Amazon had a general awareness that a particular type of item may be easily infringed.  The

4  issue is whether Amazon actually knew that specific zShops vendors were selling items that

5  infringed Corbis copyrights.  Corbis provides no evidence from which such actual knowledge

6  could be gleaned.

7        Corbis fares little better with regard to demonstrating Amazon's apparent knowledge.

8  Corbis contends that it has provided sufficient evidence to show that Amazon "knew or should

9  have known" that zShops vendors were selling infringing Corbis Images.  Corbis, however,

10  misstates the standard of knowledge necessary under § 512(c).  In determining whether a service

11  provider is "aware of facts or circumstances from which infringing activity was apparent," 17

12  U.S.C. § 512(C)(1)(A)(ii), the question is not "what a reasonable person would have deduced

13  given all the circumstances."  3 NIMMER ON COPYRIGHT, § 12B.04[A][1], at 12B-49.  Instead,

14  the question is "whether the service provider deliberately proceeded in the face of blatant factors

15  of which it was aware."  Id.  As articulated by Congress, apparent knowledge requires evidence

16  that a service provider "turned a blind eye to 'red flags' of obvious infringement."  H.R. Rep.

17  No. 105-551, pt. 2, at 42.

18        Congress's discussion of apparent knowledge, and what evidence demonstrates such

19  knowledge, is instructive.  Absent evidence of its own efforts to notify a service provider, a

20  copyright owner could establish apparent knowledge if she could show that an online location at

21  which her copyrighted material was available was clearly a "pirate site."  Id.  Pirate sites are

22  ones that are "obviously infringing because they typically use words such as 'pirate,' 'bootleg' or

23  slang terms in their URL and header information to make their illegal purpose obvious."  Id.

24  Congress described the advertisement of illegal copyright activity through such slang words as a

25  "'red flag' of obvious infringement," and indicated that the infringing nature of sites containing

26  such red flags would be apparent from even a "brief and casual viewing."  Id.  Thus, once a

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS            -26-

1   service provider is aware of a site containing such "red flags," the service provider would have

2   apparent knowledge of the infringing activity.

3        Corbis argues that its strongest evidence regarding apparent knowledge is that Amazon

4   received notices that zShops vendors were infringing the copyrights of unrelated parties by

5   selling celebrity photographs.  There are a number of problems with this evidence.  First, it is not

6   clear which, if any, of the vendors that were the subject of the third party notices are also vendor

7   defendants in this litigation.  Second, notices of infringement must substantially comply with the

8   DMCA's notice requirements to be considered evidence of a service provider's knowledge.  See

9   ALS Scan, 239 F.3d at 625; 17 U.S.C. § 512(c)(3)(B)(i).  Corbis, however, makes no attempt to

10   suggest that these third party notices were DMCA compliant.  Assuming that they did comply,

11   Corbis runs into yet another problem; the notices would still not be considered as evidence of

12   knowledge if Amazon acted expeditiously to cancel the complained of listings.  See 17 U.S.C.

13   § 512(c)(1)(C).  Amazon has asserted that it promptly cancels a listing after receiving a notice of

14   infringement, and Corbis never directly challenges that assertion.

15        Sweeping aside these difficulties, the third party notices do not, in themselves, constitute

16   red flags.  As Congress suggested, evidence of blatant copyright infringement will often derive

17   from information on the offending site.  See, e.g., H.R. Rep. No. 105-551, pt. 2, at 42.  Outside

18   of the fact that the zShop vendors sold pictures of celebrities, Corbis is silent regarding the

19   content of the complained of listings.  There is simply nothing to suggest that the vendor listings

20   contained evidence of blatant copyright infringement.  As a result, even if the notices of

21   infringement would have caused Amazon to examine the content of the zShops sites, Corbis has

22   failed to close the link by showing that those sites contained the type of blatant infringing

23   activity that would have sent up a red flag for Amazon.

24        Corbis's other evidence of "red flags" is similarly unavailing.  Corbis points out that

25   IMDb representatives met with Corbis representatives in 2001 and that Amazon's corporate

26   counsel was employed at Corbis between 1993 and 1998.  See Pl.'s 512(c) Mot. at 8-10.  Corbis

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -27-

1   indicates that these events provide a link between Amazon and Corbis from which apparent

2   knowledge can be inferred.  Even ignoring the tenuousness of these links,[10] it would only

3   suggest that Amazon had general knowledge that photos may be the subject of online copyright

4   infringement.  It provides no evidence from which to infer that Amazon was aware of, but chose

5   to ignore, red flags of blatant copyright infringement on specific zShops sites.

**b.  Amazon Does Not Have the Right and Ability to Control the Infringing Activity.**

A service provider will be excluded from the § 512(c) safe harbor if it (1) "has the right

and ability to control" the infringing activity, and (2) receives "a financial benefit directly

attributable to the infringing activity."  17 U.S.C. § 512(c)(1)(B).  Both elements must be met for

the safe harbor to be denied.  See 3 NIMMER ON COPYRIGHT, § 12 12B.04[A][1], at 12B-50.

One court has already ruled on Amazon's right and ability to control infringing activity on

its third party vendor platforms.  In Hendrickson v. Amazon.Com, the Central District of

California held that Amazon had satisfied this component of § 512(c), finding that

> Amazon merely provided the forum for an independent third party
> seller to list and sell his merchandise.  Amazon was not actively
> involved in the listing, bidding, sale or delivery of [the infringing
> item].  The fact that Amazon generated automatic email responses
> when the [infringing item] was listed and again when it was sold,
> does not mean that Amazon was actively involved in the sale.  Once
> a third party seller decides to list an item, the responsibility is on the
> seller to consummate the sale.  While Amazon does provide

---

[10]Representatives from IMDb and Corbis had one meeting in 2000.  Although this
meeting would have made IMDb aware that Corbis licensed images of celebrities, Corbis does
not assert that it made Amazon aware that Corbis faced an infringement threat from any of the
zShops vendors.  Furthermore, the employee who left Corbis to join Amazon was not involved
in acquiring the group of images that are involved in this litigation.  See Def.'s Opp. to Pl.'s
§ 512(c) Mot. at 11.  Given that Corbis, itself, had to first conduct an investigation before
determining whether zShops vendors were selling unauthorized images, see Dkt. # 188, Decl. of
Charles C. Sipos in Supp. of Def.'s Reply to DMCA Mot. ("Sipos Reply Decl."), at ¶ 2, p. 7, it is
difficult to imagine that Amazon would have gleaned such knowledge based on these
connections.

> transaction processing for credit card purchases, that additional
> service does not give Amazon control over the sale. In sum,
> Amazon's evidence shows that it did not have control of the sale of
> [the infringing item].

Amazon, 298 F.Supp.2d at 918.

Corbis attempts to distinguish Amazon in two ways. First, Corbis notes that, unlike the plaintiff in Amazon, Corbis has presented evidence that Amazon was able to identify vendors and the items sold on the zShops platform. As an example, Corbis notes that Amazon terminated the zShops defendants on the same day Corbis filed and served its complaint. This evidence, however, does not suggest a right and ability to control under the DMCA. Courts have routinely held that "the right and ability to control infringing activity, 'as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system.'" CCBill, 340 F.Supp.2d at 1098 (citing Costar, 164 F.Supp.2d at 704). This Court agrees. Merely because Amazon could identify the zShops defendants and terminate their accounts does not mean they exercised the type of right and ability to control that would disqualify them from § 512(c) safe harbor.

Second, Corbis notes that Amazon met with several vendors of movie posters when the zShops site was launched in 1999. Amazon encouraged these vendors to list their items on zShops. Implicit in this argument is that Amazon knew, or should have known, that movie poster vendors were solely in the copyright infringement business. As discussed above, there is no evidence to warrant such a conclusion, much less to impute that knowledge to Amazon. Without some indication that Amazon intended to pick infringing material for its site, the fact that it advertised the zShops platform does not amount to a right and ability to control the items sold there.

Outside of providing the zShops platform, Amazon did not have the right or ability to control vendor sales. Amazon is never in possession of the products sold by zShops vendors. See Orpet Decl. at ¶ 9; compare eBay, 165 F.Supp.2d at 1094. Furthermore, Amazon does not

1    preview the products prior to their listing, does not edit the product descriptions, does not

2    suggest prices, or otherwise involve itself in the sale. See id.; compare Cybernet, 213 F.Supp.2d

3    at 1181-82 (service provider maintains right and ability to control where it prescreens sites, gives

4    extensive advice regarding content, and prohibits the proliferation of identical sites). The

5    evidence provided by Corbis does not sufficiently distinguish the previous finding in Amazon.

6    See 298 F.Supp.2d at 918.

7         Because Amazon does not have the right and ability to control the infringing material, it

8    is not necessary for this Court to inquire as to whether Amazon receives a direct financial benefit

9    from the allegedly infringing conduct. See CCbill, 340 F.Supp. at 1098.

10        **4.    Conclusions Regarding DMCA Liability Protection.**

11        Amazon has satisfied all of the threshold conditions for DMCA protection and all of the

12   requirements for protection under the § 512(c) safe harbor. As a result, Amazon is immune from

13   all monetary relief and, save the limited relief in 17 U.S.C. § 512(j), all forms of injunctive relief

14   for any copyright infringement committed by zShops vendors on the Amazon site.[11] There is no

15   genuine issue of material fact that Amazon is entitled to safe harbor protection under § 512(c).

16        Since the DMCA protects Amazon from liability for the 230 images displayed on the

17   zShops listings, this Court grants Amazon's motion for partial summary judgment regarding

18   Corbis's claims of direct copyright infringement relating to those 230 images (Dkt. # 153). In

19   practical terms, the damages and injunctive relief sought by Corbis are no longer available and

20   the direct infringement claims related to the 230 images on zShops have become moot. See

21   Seven Words LLC v. Network Solutions, 260 F.3d 1089, 1095 (9th Cir. 2001) (where relief no

22   longer available, plaintiff's claim is moot). The only relief Corbis could seek is the limited

23   injunctive relief set forth in § 512(j) of the DMCA. Corbis has never requested such relief and,

24

25        [11]Amazon has not asserted that DMCA protection applies to Corbis Images that appeared
     on IMDb. Accordingly, Corbis's Motion for Partial Summary Judgment Against Amazon as to
26   DMCA Eligibility for Its IMDb Platform (Dkt. # 144) is granted.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS            -30-

1  considering that Amazon has asserted that it has terminated the accounts of the defendant

2  vendors, it is not certain how the limited injunctive relief would apply in the context of this

3  litigation.  See Friends of the Payette v. Horseshoe Bend Hydroelec., 988 F.2d 989, 996 (9th Cir.

4  1993) (an issue is moot where the court can no longer provide a cognizable remedy).  At this

5  point, any opinion rendered on the direct copyright infringement claims related to the 230

6  zShops images would be merely advisory.

7  **B.      Subject Matter Jurisdiction and Registration of Copyrights.**

8          17 U.S.C. § 411(a) prohibits a party from suing for copyright infringement in any district

9  court "until registration of the copyright claim has been made in accordance with this title."[12]

10 The parties agree that some of the Corbis Images that Corbis claims have been infringed have

11 been submitted to the Copyright Office, but have yet to be registered by the Register of

12 Copyrights.[13]  Amazon argues that under § 411(a), this court has subject matter jurisdiction with

13

14          [12] 17 U.S.C. § 411(a) states in full:

15          Except for an action brought for a violation of the rights of the author under
            section 106A(a), and subject to the provisions of subsection (b), no action for
16          infringement of the copyright in any United States work shall be instituted until
17          registration of the copyright claim has been made in accordance with this title.  In
            any case, however, where the deposit, application, and fee required for registration
18          have been delivered to the Copyright Office in proper form and registration has
19          been refused, the applicant is entitled to institute an action for infringement if
            notice thereof, with a copy of the complaint, is served on the Register of
20          Copyrights.  The Register may, at his or her option, become a party to the action
21          with respect to the issue of registrability of the copyright claim by entering an
            appearance within sixty days after such service, but the Register's failure to
22          become a party shall not deprive the court of jurisdiction to determine that issue.

23
          [13] The number of Corbis Images that have not been registered by the Register of
24  Copyrights is in dispute.  Amazon indicates that 86 of the Corbis Images were not registered at
25  the time this case was filed.  See Dkt. # 215, Reply in Supp. of Def.'s Copyright Reg. Mot. at 8-9
    n.10.  Corbis contends that only 19 of the Corbis Images have not been registered by the Register
26  of Copyrights.  See Dkt. # 195, Opp. to Def.'s Copyright Reg. Mot. at 2.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS          -31-

1  regard to only the Corbis Images for which the Copyright Office has granted copyright

2  registration. For those Corbis Images that are still pending registration, Amazon argues that the

3  copyright infringement claims must be denied.

4  There is a split in authority on this issue. Some courts have concluded that a pending

5  registration does confer federal jurisdiction over a copyright claim. See, e.g., Apple Barrel

6  Productions, Inc. v. Beard, 730 F.2d 384, 386-87 (5th Cir. 1984); Dielsi v. Falk, 916 F.Supp. 985,

7  994 n.6 (C.D. Cal 1996). These courts have concluded that the term "registration" in § 411(a)

8  refers to "the moment that the plaintiff delivers the fee, deposit and application to the Copyright

9  Office." Loree Rodkin Management Corp. v. Ross-Simons, Inc., 315 F.Supp.2d 1053, 1054-55

10 (C.D. Cal. 2004). The leading treatise on copyright law has concluded that this is the "better

11 point of view." 2 NIMMER ON COPYRIGHT § 716[B][1][a], at 7-155. Other courts have

12 concluded, however, that registration only occurs when the Copyright Office grants the

13 registration application and conveys a certificate of registration. See, e.g., Loree, 315 F.Supp.2d

14 at 1055; Corbis Corp. v. UGO Networks, Inc., 322 F.Supp.2d 520, 522 (S.D.N.Y. 2004); Capitol

15 Records, Inc. v. Wings Digital Corp., 218 F.Supp.2d 280, 284 (E.D.N.Y. 2002); U-Neck, Inc. v.

16 Wal-Mart Stores, Inc., 147 F.Supp.2d 158, 169 (S.D.N.Y. 2001).

17 This Court agrees with the second group of decisions. A district court does not have

18 subject matter jurisdiction over an infringement claim until the Copyright Office grants the

19 registration application and issues a certificate of registration. A review of the plain language of

20 the Copyright Act supports this conclusion. Section 411(a) makes it clear that jurisdiction is not

21 conveyed "until registration of the copyright claim has been made in accordance with [the

22 Copyright Act]." 17 U.S.C. § 411(a). Section 410(a) indicates that a claim must be examined

23 and approved by the Register of Copyrights before it is registered.

24
When, after examination, the Register of Copyrights determines that
... the material deposited constitutes copyrightable subject matter
25 and that the other legal and formal requirements of this title have
been met, the Register shall register the claim and issue to the
26 applicant a certificate of registration under the seal of the Copyright

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -32-

1    Office.

2    17 U.S.C. § 410(a). Although submission of a claim begins the registration process, a claim is

3    not registered until it is approved by the Register of Copyrights. Under the plain meaning of the

4    language, the Register's approval triggers this Court's jurisdiction.

5           Apple Barrel and the group of cases holding otherwise rely on the analysis in NIMMER to

6    support their position. See, e.g., Apple Barrel, 730 F.2d at 386-87; Dielsi, 916 F.Supp. at 994

7    n.6. NIMMER recognizes that the language of § 411(a) mandates registration of a copyright

8    before a suit may be filed. See 2 NIMMER ON COPYRIGHT, § 716[B][1][a], at 7-155. NIMMER,

9    however, states that the second sentence of § 412(a) provides an important exception to the rule

10   – a copyright applicant who has been denied registration is also entitled "to institute an action for

11   infringement if notice thereof, with a copy of the complaint, is served on the Register of

12   Copyrights." 17 U.S.C. § 412(a). NIMMER argues that because an applicant is entitled to federal

13   court jurisdiction regardless of the outcome of the registration application, the applicant "who

14   seeks to register may proceed to litigate a claim, regardless of whether the Copyright Office

15   ultimately issues the claim, or by contrast denies it. . . ." 2 NIMMER ON COPYRIGHT,

16   § 716[B][1][a], at 7-155.

17          Adopting this approach requires inserting language into § 411(a) that simply is not there.

18   As conceded in NIMMER, under the interpretation it advances, "it makes sense . . . to refer to

19   application for registration [and not registration, itself] as a condition to filing an infringement

20   action, whereas issuance of a registration certificate is a condition to statutory damages . . . and

21   the other [benefits of registration.]" Id. (emphasis in original). This Court, however, would

22   overstep its interpretive bounds if it read § 411(a) so broadly. Section 411(a) indicates who may

23   invoke this Court's jurisdiction for violation of the Copyright Act (those who have received a

24   final determination on their application to register their copyright) and, by implication, excludes

25   everyone else (those who have either not registered or whose applications for registration are

26   pending). A statute like § 411(a) that "authorizes specific action and designates a particular

1  party empowered to take it is surely among the least appropriate in which to presume

2  nonexclusivity. 'Where a statute . . . names the parties granted [the] right to invoke its

3  provisions . . . such parties only may act.'" Hartford Underwriters Ins. v. Union Planters Bank,

4  N.A., 530 U.S. 1, 6-7, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting 2A N. Singer,

5  SUTHERLAND ON STATUTORY CONSTRUCTION § 47.23, p. 217 (5th ed. 1992)).

6       Here, § 411(a) gives those who have applied and obtained registration and those who

7  have applied and failed to obtain registration the right to file suit in federal court. This Court

8  will not expand the meaning of the statute to include those whose applications are pending but

9  undecided. As a result, the copyright claims relating to Corbis Images for which Corbis does not

10 have a certificate of registration are dismissed for lack of subject matter jurisdiction.

11 **C.    Direct and Vicarious Copyright Infringement.**

12      Corbis has filed a motion for partial summary judgment on its claims of direct and

13 vicarious copyright infringement (Dkt. # 147), and Amazon has filed a motion for partial

14 summary judgment challenging Corbis's copyrights and alleging copyright misuse (Dkt. # 151).

15 Once the claims arising from DMCA-protected activity and the claims relating to unregistered

16 images have been culled, only two direct copyright infringement claims, both regarding a

17 photograph that appeared on the IMDb website, remain.

18      To prove direct copyright infringement against Amazon, Corbis must demonstrate that

19 (1) it owns a valid copyright, and (2) Amazon itself violated one or more of Corbis's exclusive

20 rights under the Copyright Act. See Ellison, 357 F.3d at 1076; see also A&M Records, Inc. v.

21 Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001). The exclusive rights conveyed by copyright

22 ownership include the right to reproduce the work, the right to prepare derivative works based on

23 the work, the right to distribute copies of the work to the public and the right to display the work

24 publicly. See 17 U.S.C. § 106(1)-(3) & (5).

25      Corbis claims that it owns the copyright to a photograph of actor Erika Christensen taken

26 by photographer David Ash (the "Christensen Photo"). The Christensen Photo appeared among

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS      -34-

1   a montage of celebrity photographs in an advertisement banner on IMDb that provided a link to

2   Amazon's zShops platform.  Corbis has moved for summary judgment regarding whether

3   Amazon directly violated its copyright interests in the Christensen Photo by displaying it on

4   IMDb.[14]  Amazon argues that it should be entitled to summary judgment because Corbis has

5   failed to provide evidence that the Christensen Photo has been registered by the Copyright

6   Office.

7         Existence of a certificate of registration from the United States Copyright Office

8   ("registration certificate") is prima facie evidence of a valid copyright.  See 17 U.S.C. § 410(c);

9   Apple Computer, Inc. v. Formula Intern. Inc., 725 F.2d 521, 523 (9th Cir. 1984).  Corbis has

10   provided a registration certificate numbered VA 1-181-996 ("Registration No. '996"), which it

11   claims covers its derivative and compilation copyright interests in the Christensen Photo.  See

12   Keeley Decl. at 162.  Registration No. '966 is entitled "Corbis Digital Online October 2002 &

13   Automated Database."  See Dkt. # 217, Supp. Decl. of Beth A. Colgan in Supp. of Mot. for

14   Partial Summ. J. on Lack of Copyright Registrations ("Colgan Supp. Decl."), Ex. 67, p. 371.

15   Corbis is listed as an author along with photographers "Fabian Cevallos, John Springer,

16   Micheline Pelletier & Others."  Id.  The work is listed as a derivative or compilation and is

17   described as "[m]onthly updates of new unpublished photographs and digitally enhanced images,

18   as well as a compilation of digitally enhanced, unpublished, previously published and public

19   domain images."  Id. at 372.  A deposit of the work was filed with the Copyright Office.  See id.

20   at 371.

21         Corbis has also provided a second registration certificate numbered VA 1-207-124

22

23

24       [14]Corbis also claimed that Amazon directly infringed its copyrights in an image of Vin
Diesel displayed on IMDb.  Corbis, however, has acknowledged that it has applied for

25   registration of the Vin Diesel image but that the image has yet to be registered.  As a result, this

26   Court does not have subject matter jurisdiction with respect to that image.  See Section III. B,
infra.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS       -35-

1  ("Registration No. '124"), which it claims covers the photographer's copyright interests in the

2  Christensen Photo. See Dkt. # 209, Decl. of Claire L. Keeley in Supp. of Corbis's Mots. for

3  Summ. J. ("Keeley S.J. Decl."), at 622-623. Registration No. '124 is entitled "Erika

4  Christensen" and indicates that the photograph was published in Detour magazine in November,

5  2000. Id. David Ash submitted the photograph and is listed as its author.[15] A copy of the

6  photograph was deposited with the Copyright Office.

7       Corbis has provided the Court with a spreadsheet listing the 232 images it claims have

8  been infringed. See Keeley Opp. Decl., at ¶ 10, pp. 030-087. The spreadsheet indicates that the

9  Christensen Photo is copyrighted under Registration Nos. '966 and '124 . See id. at 047. Corbis

10  argues that Registration Nos. '966 and '124, combined with its spreadsheet, demonstrate prima

11  facie evidence of valid copyrights in the Christensen Photo. Amazon, in turn, has spent much

12  time and energy pointing out inconsistencies in the Corbis spreadsheet. Amazon argues that it

13  should be granted summary judgment because Corbis has failed to prove that it owns the

14  copyrights to the Christensen Photo.

15       There exists a legitimate question of fact regarding whether Registration Nos. '966 and

16

17         [15]Amazon also argues that Corbis should be denied summary judgment because it does

18  not have standing to assert an infringement of Mr. Ash's copyright interest in the Christensen

19  Photo. Although not a model of clarity, Corbis's contract with Mr. Ash states that Mr. Ash

    transfers to Corbis "the right to use, reproduce, publish, exhibit, perform, publicly display,

20  distribute, broadcast and transmit [the photographs]." Dkt. # 149, Decl. of David N. Weiskopf

21  in Supp. of Pl.'s Mots. for Part. Sum. J., ¶ 3, at 32. Corbis has "full and complete authority to

    make and settle claims or to institute proceedings in Corbis's or [Mr. Ash's] name but at

22  Corbis's expense to recover damages for [the photographs] . . . and for the unauthorized use of

23  [the photographs]." Id. at 34. The rights transferred by the contract are among those exclusive

    rights enumerated in § 106 of the Copyright Act. See 17 U.S.C. § 106. It is well-settled that the

24  recipient of such transferred rights may sue for infringement of those rights. See Campbell v.

25  Board of Trustees of Leland Stanford Junior University, 817 F.2d 499, 504 (9th Cir. 1987) (citing

26  17 U.S.C. § 501(d)).

1  '124 cover the Christensen Photo.  Although Corbis does have copyright certificates, those

2  certificates ares only prima facie evidence of "'the validity of the copyright and of the facts

3  stated in the certificate.'"  Seiler v. Lucasfilm, Ltd., 808 F.2d 1316, 1321 (9th Cir. 1986) (quoting

4  17 U.S.C. § 401(c)), cert. denied, 484 U.S. 826 (1987).  The facts stated in the '966 certificate

5  make no mention of Mr. Ash, Ms. Christensen, or the photograph.  The '124 certificate fares

6  little better, merely indicating that it covers a photograph of Erika Christensen taken by David

7  Ash.  Although the Corbis spreadsheet links the registrations with the Christensen Photo, there is

8  no way to corroborate this link.  There is nothing on the face of the certificates for Registration

9  Nos. '966 and '124 to confirm that the Christensen Photo is included among the deposited

10  photos.  The only way to determine with any certainty whether Registration Nos. '966 and '124

11  cover the Christensen Photo is to review a copy of the deposits included with the registration

12  applications.

13          Although the deposits are equally available to both parties from the Copyright Office, see

14  Copyright Office Circular 6 (2002), neither party bothered to obtain a copy of the deposits and

15  provide them to the Court.  Without the deposit, Corbis cannot show that the Christensen Photo

16  is among the photographs covered by Registration Nos. '966 and '124.  Because Amazon has

17  equal access to the deposit, it cannot simply rest on Corbis's failure to provide the evidence.  To

18  prove that Registration Nos. '966 and '124 do not protect the Christensen Photo, Amazon has an

19  obligation to obtain and provide the evidence available to it.  Without the deposit, there remains

20  a legitimate question of fact regarding whether the Christensen Photo is protected by

21  Registration Nos. '966 and '124.

22          For the same reasons, Amazon's challenge to Registration No. '966 as a derivative

23  copyright (Dkt. # 151) must also be denied.  Amazon's motion is premised on the theory that

24  Registration No. '966 is invalid because the enhanced image lacks sufficient originality and

25  would negatively impact the original copyrighted image.  Determining whether Amazon is

26  correct requires a comparison of the images deposited with the Copyright Office for Registration

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -37-

1   No. '966 with the image deposited for Registration No. '124. As noted, neither party has

2   provided that information, and this Court is simply unable to tell whether the '966 Copyright is

3   valid without viewing the deposits.[16]

4        Finally, Amazon has also filed a motion for partial summary judgment on Corbis's

5   measure of actual damages (Dkt. # 154). Amazon contends that Corbis's measure of actual

6   damages is too speculative and should be rejected by this Court. In accord with this Order, at

7   most Corbis is entitled to damages only for violations of its copyright interests in Registration

8   Nos. '966 and '124 by the unauthorized display of the Christensen Photo on IMDb. The motion

9   on actual damages addressed Corbis's calculation of damages with regard to all 232 photos that

10  Corbis alleged were infringed. Because this Order changes the scope and extent of the damages

11  available to Corbis, the Court denies Amazon's motion regarding damages. Either party may

12  revisit this issue if, after consultation, they determine that the issue of actual damages with

13  respect to the Christensen Photo is ripe for summary judgment.

14  **D.   Lanham Act and State Law Claim.**

15       **1.   Lanham Act Claims.**

16       In its complaint, Corbis alleges claims of trademark dilution under § 43(c) of the Lanham

17  Act, 15 U.S.C. § 1125(c), et seq., and false designation of origin under § 43(a) of the Lanham

18  Act, 15 U.S.C. § 1125(a). See Compl. ¶¶ 120-144. Amazon has moved for summary judgment

19  with regard to these claims. See Def.'s Trademark and State Law Mot. at 2. In its opposition,

20  Corbis failed to proffer any argument in support of its trademark dilution claim. See, generally,

21  Opp. to Def.'s Trademark and State Law Mot. As a result, this Court grants Amazon's motion

22

---

23       [16]Amazon's defense of copyright misuse (Dkt. # 151) is also denied. Corbis has not
24  overstepped its bounds in pursuing its copyright interests. The areas of copyright litigation
     touched on by this suit are relatively new, often conflicting and certainly open to the
25  interpretation adopted by Corbis. The evidence does not support a conclusion that Corbis is
     using its copyright interests "in a manner violative of the public policy embodied in the grant of
26  a copyright." Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 978 (4th Cir. 1990).

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS          -38-

1   for summary judgment with regard to that claim. See Fed. R. Civ. P. 56(e).  For the reasons set

2   forth below, this Court also grants Amazon's motion for summary judgment under § 43(a) of the

3   Lanham Act.

4        Section 43(a) prohibits the use of false designations of origin and false representations in

5   the advertising and sale of goods and services.  See Smith v. Montoro, 648 F.2d 602, 603 (9th

6   Cir. 1981).  Among the activities proscribed under the Lanham Act is "reverse passing off."

7   Reverse passing off occurs when someone markets a product as her own, even though someone

8   else created the product.  See id. at 1441.  It can occur either "expressly," when the wrongdoer

9   removes the trademark of another and sells that product under a name chosen by the wrongdoer,

10  or "impliedly," when the wrongdoer simply removes or otherwise obliterates the name of the

11  manufacturer or source and sells the product in an unbranded state.  See Shaw v. Lindheim, 919

12  F.2d 1353, 1364 (9th Cir. 1990).

13       Corbis provides two alternative versions of its implied reverse passing off claim.  First,

14  Corbis alleges that Amazon committed reverse passing off by displaying Corbis Images on

15  IMDb without crediting Corbis or its photographers for those images, and instead

16  misrepresenting that the images came from other sources.  See Pl.'s Opp. to Def.'s Trademark

17  and State Law Mot. at 7.  Second, Corbis asserts that the zShops vendors committed reverse

18  passing off and that Amazon is contributarily liable for their conduct.

19       Courts have been reluctant to allow an overlap between claims involving the Lanham Act

20  and copyright law and have dismissed Lanham Act claims where the copyright laws provided an

21  adequate remedy.  See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 34, 123

22  S.Ct. 2041, 2048, 156 L.Ed.2d 18, 30 (2003); see also Shaw, 919 F.2d at 1364-65 ("We decline

23  to expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act

24  provides an adequate remedy").  Amazon asserts that Corbis's Lanham Act claim is a mere

25  reiteration of its claims under the Copyright Act and, according to Dastar and Shaw, should be

26  dismissed.

The subject matter of copyright is set forth in 17 U.S.C. § 102(a). It states that:

Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:
(5) pictorial, graphic, and sculptural works . . .

See id. Corbis summarizes its Lanham Act claim by stating that Amazon "displayed Corbis's images on its web site, IMDb.com, without permission or license from Corbis. Additionally, Corbis's images were sold on Amazon.com's zShops, without permission from or credit to Corbis or its photographers." Pl.'s Opp. to Def.'s Trademark and State Law Mot. at 1-2. The Copyright Act, however, expressly provides protection for such wrongdoing. See 17 U.S.C. §§ 106 & 501. Indeed, § 106 indicates that an owner of a copyright in a photograph has the exclusive rights to reproduce, distribute copies of, and display that photograph. See 17 U.S.C. §§ 102(a)(5), 106(1), (3), & (5). The Copyright Act provides for monetary remedies, including recovery of both the owner's actual damages and the infringer's profits, and, in some circumstances, statutory damages, (17 U.S.C. § 504(a)-(c)), injunctive remedies, (17 U.S.C. § 502), and attorney's fees, (17 U.S.C. § 505).

By Corbis's own admission, it seeks the same remedies under the Lanham Act as are available under the Copyright Act. See Pl.'s Opp. to Def.'s Trademark and State Law Mot. at 10 ("damages available under the Lanham Act include profits of the defendant and damages sustained by the plaintiff"). What is more, Corbis concedes that the "Ninth Circuit has refused to expand Lanham Act protection in cases where the Copyright Act provides an adequate remedy." Pl.'s Opp. to Def.'s Trademark and State Law Mot. at 6 (emphasis in original). Nevertheless, Corbis asserts that these redundant claims are permissible here because both the Copyright Act claim and Lanham Act claim involve "bodily appropriation." See id. (citing Salim v. Lee, 202 F.Supp.2d 1122, 1128 (C.D. Cal. 2002)).

Corbis's attempt to create an overlap between the Copyright Act and the Lanham Act

1 | fails for the following reasons. First, to be a cognizable violation of the Lanham Act, reverse
2 | passing off must <u>always</u> include bodily appropriation. <u>See</u> <u>Shaw</u>, 919 F.2d at 1364; <u>Summit</u>
3 | <u>Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.</u>, 7 F.3d 1434, 1438 (9th Cir. 1993). The <u>Salim</u>
4 | holding promoted by Corbis would, it seems, allow for an overlap between the Copyright Act
5 | and Lanham Act in all reverse passing off cases. The Ninth Circuit, however, has expressly
6 | indicated a reluctance to allow such an overlap. <u>See</u> <u>Shaw</u>, 919 F.2d at 1364-65 ("We decline to
7 | expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides
8 | an adequate remedy"). And the Supreme Court recently has confirmed an interest in maintaining
9 | a distinction between the two claims. <u>See</u> <u>Dastar</u>, 539 U.S. at 34 ("in construing the Lanham
10 | Act, we have been 'careful to caution against misuse or over-extension' of trademark and related
11 | protections into areas traditionally occupied by patent or copyright") (<u>quoting</u> <u>TrafFix Devices,</u>
12 | <u>Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001)).

13 |     <u>Cleary v. News Corp.</u>, 30 F.3d 1255, 1261 (9th Cir. 1994), does not invite an overlap
14 | between the two causes of action. In <u>Cleary</u>, the Ninth Circuit confirmed that reverse passing off
15 | under the Lanham Act requires bodily appropriation of misattributed material. <u>See</u> 30 F.3d at
16 | 1261. In an effort to define the term 'bodily appropriation,' the <u>Cleary</u> court adopted the
17 | definition of the term that is used in the context of copyright law: "'copying or unauthorized use
18 | of substantially the entire item.'" <u>Id.</u> (quoting <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889
19 | F.2d 197, 205 (9th Cir. 1989). The plaintiff in <u>Cleary</u> did not allege a copyright claim, and the
20 | Court only assumed, for the sake of argument, that the plaintiff had successfully alleged a
21 | Lanham Act claim. The <u>Cleary</u> court did not suggest an overlap between causes of action under
22 | the Copyright Act and the Lanham Act, it only held that a similar definition of 'bodily
23 | appropriation' could be used under the two statutes.

24 |     **2.   State Law Claims.**

25 |     Corbis asserts state law causes of action for violation of the Consumer Protection Act,
26 | R.C.W. 19.86.020 <u>et seq.</u>, and for tortious interference with business relationships. Amazon

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS        -41-

1   argues that the state law claims should be dismissed because they are barred by the

2   Communications Decency Act of 1996 (the "CDA"), 47 U.S.C. § 230, and because they are

3   preempted by the Copyright Act.  Because this Court finds that the claims are barred by the

4   CDA, it need not address whether they are preempted by the Copyright Act.

5          Section 230 of the CDA states, in part, that "[n]o provider or user of an interactive

6   computer service shall be treated as the publisher or speaker of any information provided by

7   another information content provider."  47 U.S.C. § 230(c)(1).  In addition, the CDA preempts

8   any inconsistent state or local law.  See 47 U.S.C. § 230(e)(3).  As a result, the CDA "creates a

9   federal immunity to any cause of action that would make service providers liable for information

10  originating with a third-party user of the service."  Zeran v. America Online, Inc., 129 F.3d 327,

11  330 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998).

12         Immunity from state law claims under § 230 requires that: (1) defendant be a service

13  provider or user of an interactive computer service; (2) the cause of action treat a defendant as a

14  publisher or speaker of information; and (3) a different information content provider provided

15  the information.  See 47 U.S.C. § 230(c)(1).  Corbis does not contest that Amazon meets the first

16  two elements of § 230 immunity.  Corbis does assert, however, that Amazon fails to satisfy the

17  last element.  Corbis argues that Amazon "shaped the content of what was offered for sale on its

18  zShops and directly provided the unauthorized images displayed on its IMDb.com platform."

19  Pl.'s Opp. to Def.'s Trademark and State Law Mot. at 14.

20         Section 230(c) "provides broad immunity for publishing content provided primarily by

21  third parties."  Carafana v. Metrosplash.Com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003).  "[S]o

22  long as a third party willingly provides the essential published content, the interactive service

23  provider receives full immunity regardless of the specific editing or selection process."  Id.

24  Here, it is undisputed that the zShops vendors provided the images that were displayed on the

25  zShops sites.  Although Amazon may have encouraged third parties to use the zShops platform

26  and provided tools to assist them, that does not disqualify it from immunity under § 230 because

1   the zShops vendor ultimately decided what information to put on its site. See id. at 1124 (§ 230

2   immunity granted where "the selection of the content was left exclusively to the user" even if

3   service provider "facilitated expression of information").

4        Corbis asserts that Amazon cannot maintain immunity with regard to images on IMDb

5   because "Amazon was the information content provider." Pl.'s Opp. to Def.'s Trademark and

6   State Law Mot. at 13-14. Assuming this to be true, § 230 "precludes treatment as a publisher or

7   speaker for 'any information provided by another information content provider.'" Carafana, 339

8   F.3d at 1125 (quoting 47 U.S.C. § 230(c)(1)) (emphasis in original). Corbis's claims are barred

9   unless Amazon "created or developed the particular information at issue." Id. The evidence

10  indicates that Amazon did not create or develop the images posted on IMDb. As Corbis itself

11  has recognized, Amazon may have published the images on its IMDb site, but those images were

12  provided by the zShops vendors.[17]

13                          **IV. CONCLUSION**

14       For the foregoing reasons, Amazon's Motion for Summary Judgment Under the Digital

15  Millennium Copyright Act (Dkt. # 132) is GRANTED, Corbis's Motion for Partial Summary

16  Judgment Regarding § 512(c) "Safe Harbor" Qualification under the DMCA (Dkt. # 145) is

17  DENIED, Corbis's Motion for Partial Summary Judgment Against Amazon Precluding

18  Application of DMCA for Lack of Compliance with 17 U.S.C. § 512(i) (Dkt. # 146) is DENIED,

19  Corbis's Motion for Partial Summary Judgment Against Amazon as to DMCA Eligibility for Its

20  IMDb Platform (Dkt. # 144) is GRANTED, Amazon's Motion for Partial Summary Judgment

21  Denying Corbis's Direct Copyright Infringement Claims (Dkt. # 153) is GRANTED, Corbis's

22

23

24       [17]Because Amazon has immunity under the CDA, the Court need not entertain Amazon's
    final motion for summary judgment challenging Corbis's claims for damages relating to the
25  claim of tortious interference with business relationships (Dkt. 105). Because the CDA prevents
    Corbis from asserting the tortious interference claim, summary judgment is granted in Amazon's
26  favor and those claims are dismissed.

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS              -43-

1  Motion for Partial Summary Judgment Against Amazon for Direct and Vicarious Copyright

2  Liability (Dkt. # 147) is DENIED, Amazon's Motion for Partial Summary Judgment on

3  Plaintiff's State Law Claims (Dkt. # 132) is GRANTED, Amazon's Motion for Partial Summary

4  Judgment on Copyright and Copyright Misuse (Dkt. # 151) is DENIED, Amazon's Motion for

5  Partial Summary Judgment on Plaintiff's Actual Damages (Dkt. # 163) is DENIED, and

6  Amazon's Motion for Partial Summary Judgment on Plaintiff's Claim and Damages for Tortious

7  Interference with Business Relationships (Dkt. # 105) is GRANTED.

8       DATED this 21st day of December, 2004.

9

10

11  Robert S. Lasnik
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER REGARDING
SUMMARY JUDGMENT MOTIONS                    -44-